**In re GRIFFIN TRADING COMPANY, INC., Debtor.**

**Leroy G. Inskeep, not individually but as Trustee for Griffin Trading Company, Inc., Plaintiff,**

v.

**Farrel J. Griffin and Roger S. Griffin, Defendants.**

Bankruptcy No. 98 B 41742.
Adversary No. 01 A 00007.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Oct. 30, 2009.

Catherine L. Steege, for Plaintiff–Trustee.

E. King Poor and Matthais A. Lydon, for Defendant.

### Memorandum Opinion

BRUCE W. BLACK, Bankruptcy Judge.

This matter comes before the court pursuant to a Memorandum Opinion and Order dated January 23, 2008, from the United States District Court for the Northern District of Illinois, that vacated judgment entered for the trustee after a trial in 2004, and remanded for further findings, clarification, and analysis. A second trial of limited scope was held on July 13, 2009. For the reasons set forth herein, the court finds that the trustee has failed to prove causation and damages. Accordingly, judgment will be entered in favor of the Defendants.

### Jurisdictional Statement

The court has jurisdiction over the parties and the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This adversary is a core proceeding under 28 U.S.C. § 157. Therefore, this court has jurisdiction over the fiduciary duty count that is the subject of this memorandum opinion.

### Facts and Background

This case began more than ten years ago when Griffin Trading Company ("Griffin" or "Debtor"), a futures commission merchant, collapsed virtually over-night. A futures commission merchant serves as a broker for trading in the futures markets. Trading "futures" involves buying or selling standardized contracts for future delivery of commodities or financial products. Griffin's collapse was caused by a single customer, John Ho Park ("Park"), who lost nearly $10.3 million on December 21 and 22, 1998. Neither Park nor Griffin, who shared financial responsibility for the losses, had the capital to cover the substantial losses. Shortly after, on December 30, 1998, Griffin filed for Chapter 7 bankruptcy and Leroy G. Inskeep was appointed as the trustee.

Griffin was incorporated in the state of Delaware on February 23, 1976. Griffin was located exclusively in Chicago from 1976 to 1993. It was a member of the Chicago Board of Trade, the Chicago Mercantile Exchange, and the Chicago Board of Options Exchange. It was regulated in the United States by the Commodities Futures Trading Commission ("CFTC") and the Chicago Board of Trade. *See* Joint Pretrial Statement filed September 20, 2004, Stipulation of Facts ¶¶ 1, 2 (hereinafter "Stip. ——") [Doc. 86]. Both defendants, Farrel J. Griffin and Roger S. Griffin (the "Defendants"), were principals in control of Griffin at all relevant times. (1/26/05 Oral Opinion Transcript at 3.)

In 1993, Griffin opened a branch office in London where it was a member of the Securities and Futures Authority. Stip. ¶ 2. It was also a member of the London Clearing House, a clearing member of the London International Financial Futures and Options Exchange, and a member, but not clearing member, of the German future exchange, Eurex Deutschland. *Id.* Park was a relatively new London-based customer. As of December 21, 1998, Park had approximately $1.56 million in his trading account with Griffin. *Id.* at ¶ 12. Although a customer's trading is generally controlled through trading limits, on December 21 and 22, 1998, Park traded well beyond his limits and incurred multi-million dollar losses trading on the German future exchange.

Because Griffin was not a clearing member of the German future exchange, it used MeesPierson N.V. ("MeesPierson") as its clearing broker. On December 22, 1998, at 11:19 a.m. London time (5:19 a.m. Chicago time), MeesPierson issued a margin call for DM 5 million (over $2.9 million) to the Debtor to cover the initial margin on Park's trades. The margin payment provided that it was to be for value as of the next day, December 23, 1998. PX 8. In response to the margin call, the London office initiated a wire transfer. The following sequence of events are not in dispute:

a. At 11:19 a.m. London time on December 22, 1998: £1.61 million was transferred from the Debtor's account at the London Clearing House to the Debtor's customer segregated account at the Bank of Montreal Limited ("Bank of Montreal").

b. Immediately after 11:19 a.m. London time on December 22, 1998: £1.61 million was transferred from the Debtor's customer segregated Bank of Montreal account to the Debtor's account at Credit Lyonnais Rouse Limited ("Credit Lyonnais") in London.

c. At 11:51 a.m. London time on December 23, 1998: DM 5 million was transferred from the Debtor's account at Credit Lyonnais to the Debtor's account at the Bank of Montreal.

d. At 11:52 a.m. London time on December 23, 1998: DM 5 million was transferred from the Debtor's customer segregated account at the Bank of Montreal to MeesPierson's bank, Commerzbank.

In January of 2001, the bankruptcy trustee brought a five-count adversary complaint against the Defendants and their wives. Nearly all the matters were ruled on in various motions for summary judgment before the trial which occurred on September 27, 2004, and the only remaining defendants at the time of trial were Roger Griffin and Farrell Griffin. Only Count IV was the subject of the trial.

Count IV alleges breach of fiduciary duty, listing four elements to that cause of action. More specifically, Count IV alleges that the Defendants breached their fiduciary duties to creditors when they failed to stop the wire transfer of customer funds to MeesPierson after the Defendants knew or should have known that if the Debtor made the DM 5 million payment to MeesPierson, then the Debtor would be unable to return customer funds to customer-creditors and that customer-creditors would be left with a shortfall.

The parties have agreed, and the court accepts, that to prevail on the claim for breach of fiduciary duty, the trustee must prove:

1. *that Defendants were officers and directors of the Debtor;*

2. that the Debtor was insolvent or within the zone of insolvency, and, thus, the Defendants' respective fiduciary duties ran in favor of creditors of the Debtor;

3. that the Defendants' actions or failures to act breached their duties of good faith, due care, or loyalty; and

4. that such breach proximately caused the damage of which the Trustee complains.

(Joint Pretrial Statement filed September 20, 2004 at 2.)

The first two elements were determined in the trustee's favor through a partial summary judgment entered on June 30, 2004.

After the first trial, the court issued an Oral Opinion on January 26, 2005, ruling in favor of the trustee. Among other things, the court found that the trustee met the burden of proof for the cause of action alleged in Count IV. On appeal, the District Court vacated the judgment and ordered a remand for clarification of the court's ruling that the trustee met the burden of proof. More specifically, the District Court sought clarification on whether the trustee proved the causation element of liability. *Inskeep v. Griffin,* No. 05 C 1834, 2008 WL 192322, *3–4 (N.D.Ill. Jan. 23, 2008) ("Dist.Ct.Opinion").

In response to the remand, this court found it appropriate to reopen the evidence in order to clarify its previous findings of fact and conclusions of law, entering a Preliminary Pretrial Order on July 30, 2008. That order stated that:

The January 26, 2005, oral ruling is vacated to the extent it is inconsistent with the District Court memorandum opinion dated January 23, 2008. Specifically, the conclusion of law regarding segregation of customer accounts being governed by 7 U.S.C. § 6d and

17 C.F.R. § 1.20 is vacated. Further, the mixed conclusions of law and fact that "the law allowed the defendants to abort the wire transfer up until the time that the money was actually transferred" is vacated. Finally, the legal conclusion "that the amount of the transfer was the amount of damage to the estate" is vacated. All other findings and conclusions are reaffirmed.

Pursuant to that same order, the parties were ordered to brief the question of what law applied on remand to determine the question of whether "the law allowed the defendants to abort the wire transfer up until the time the money was actually transferred." On January 29, 2009, the court entered its Memorandum of Decision in which it found that Article 4A of the Illinois Uniform Commercial Code (810 ILCS 5/Art. 4A) was the applicable law, concluding that the Defendants had waived the right to argue that foreign law applied because they failed to give notice that they intended to argue that foreign law applied and they failed to show that there is a conflict between foreign law and the law of the forum—the Illinois U.C.C.

The Preliminary Pretrial Order also limited the scope of the evidentiary hearing:

The evidentiary hearing will be of limited scope to address two issues. The first issue is the element of causation, as it is influenced by proof of whether the law allowed the defendants to abort the wire transfer, as a matter of both law and fact. Several sub-issues related to the ability to stop the wire transfer include, but are not limited to: (1) what roles the banks played, (2) what bank(s) accepted the payment order and at what time, and (3) how these facts apply to governing law. These sub-issues are

within the limited scope of the evidentiary hearing.

The second issue, if causation is proved and liability found, is the amount of damages. The determination of damages will depend on, among other things, whether the defendants maintained a separate account to cover or satisfy all its current obligations to foreign futures or foreign options customers denominated as the foreign futures or foreign options secured amount pursuant to Part 30 in Chapter 17 of the Code of Federal Regulations (or any other relevant law the parties show to be applicable). The issues affecting the amount of damages will be within the limited scope of the evidentiary hearing.

A trial in accordance with the Preliminary Pretrial Order was held July 13, 2009.

### *Discussion*

As the court stated in its July 30, 2008 order, there are two basic issues to be decided on remand: causation and damages. These issues raise numerous sub-issues. The court will begin by first addressing the issue of causation.

### *CAUSATION: As a matter of law, could the defendants have stopped the wire transfer?*

The District Court's remand order specifically states that the case is remanded to the Bankruptcy Court, "for analysis of whether the Trustee established revocability under Article 4A of the Illinois U.C.C." Dist. Ct. Opinion at 25. The District Court reiterated the trustee's burden to prove each element of a negligence claim, including that of causation. *Id.* at 14. In this case, on the question of causation, the District Court pointed out that "if the funds transfer at issue was irrevocable at the point in time that Defendants became aware of the transfer, then no liability could attach based on their subsequent failure to reverse the (then-irreversible) transfer." *Id.* at 15. Here, the Court has reaffirmed its finding that both Defendants knew about MeesPierson's margin call when they learned on the morning of December 22, 1998, about the crisis in the Debtor's London office. (Preliminary Pretrial Order entered July 30, 2008) (1/26/05 Oral Opinion Transcript at 7–8). Thus, the only remaining issue is revocability under Article 4A.

The District Court referred to several "relevant definitions" in Article 4A that are necessary to understand how and when a wire transfer may be cancelled. *Id.* at 16–17. Section 103 of Article 4A defines these terms:

(a) In this Article:

   (1) "Payment order" means an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary . . .

   (2) "Beneficiary" means the person to be paid by the beneficiary's bank.

   (3) "Beneficiary's bank" means the bank identified in a payment order in which an account of the beneficiary is to be credited pursuant to the order or which otherwise is to make payment to the beneficiary if the order does not provide for payment to an account.

   (4) "Receiving bank" means the bank to which the sender's instruction is addressed.

   (5) "Sender" means the person giving the instructions to the receiving bank . . .

   . . .

(c) A payment order is issued when it is sent to the receiving bank.

810 ILCS 5/4A–103.

Section 104 defines these additional terms:

(a) "Funds transfer" means the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order ...

(b) "Intermediary bank" means a receiving bank other than the originator's bank or the beneficiary's bank.

(c) "Originator" means the sender of the first payment order in a funds transfer.

(d) "Originator's bank" means (i) the receiving bank to which the payment order of the originator is issued if the originator is not a bank, or (ii) the originator if the originator is a bank.

810 ILCS 5/4A–104

The District Court also highlighted various aspects of Article 4A. Dist. Ct. Opinion at 17. First, it pointed out that the "participants' roles in a funds transfer are not necessarily static," that is, "participants may play multiple roles simultaneously; for example, a beneficiary bank is also a receiving bank, and a receiving bank also may be an intermediary bank." *Id.* Also, "a payment order is not necessarily a payment—it is a communication from a sender to a bank, instructing that bank to pay another party. *See* 810 ILCS 5/4A–103." *Id.*

The District Court also noted that § 211 of Article 4A sets out rules for cancelling a funds transfer both before and after "acceptance." Section 211 states in relevant part:

(b) ... a communication by the sender cancelling or amending a payment order is effective to cancel or amend the order if notice of the communica-

tion is received at a time and in a manner affording the receiving bank a reasonable opportunity to act on the communication before the bank accepts the payment order.

(c) After a payment order has been accepted, cancellation or amendment of the order is not effective unless the receiving bank agrees or a funds transfer system rule allows cancellation or amendment without agreement of the bank.

810 ILCS 5/4A–211

Section 209, in turn, defines when an acceptance occurs. A receiving bank, other than a beneficiary bank, accepts "when it executes the order." 810 ILCS 5/4A–209(a). As the District Court pointed out, "[s]ection 301(a) explains that 'execution' occurs when the receiving bank 'issues a payment order intended to carry' out the sender's order." Dist. Ct. Opinion at 20, n. 3.

On the other hand, § 209(b) states that a beneficiary bank accepts "at the earliest" of:

(1) when the bank (i) pays the beneficiary as stated in Section 4A–405(a) or 4A–405(b), or (ii) notifies the beneficiary of receipt of the order or that the account of the beneficiary has been credited with respect to the order unless the notice indicates that the bank is rejecting the order or that funds with respect to the order may not be withdrawn or used until receipt of payment from the sender of the order;

(2) when the bank receives payment of the entire amount of the sender's order pursuant to Section 4A–403(a)(1) or 4A–403(a)(2); or

(3) the opening of the next funds transfer business day of the bank following the payment date of the order if,

at that time, the amount of the sender's order is fully covered by a withdrawable credit balance in an authorized account of the sender or the bank has otherwise received full payment from the sender....

810 ILCS 5/4A–209(b)

The District Court noted that the issues regarding whether and when there were acceptances by the banks "appear to be rather complicated." Dist. Ct. Opinion at 20. Yet it did identify four different times when the non-beneficiary banks may have accepted. The first two times were when the London Clearing House and Bank of Montreal made transfers:

... [O]ne might possibly conclude that London Clearing House and Bank of Montreal, via transfers of funds to Bank of Montreal and Credit Lyonnais respectively, each accepted under Section 209(a) on the morning of December 22. If London Clearing House and Bank of Montreal accepted those two payment orders on the morning of December 22, Griffin Trading seemingly (or at least potentially) would have had no unilateral right to cancel the orders. Moreover, under a technical reading of Section 211(b), Griffin Trading would have been unable to cancel any payment order except the order that it sent to London Clearing House.

Dist. Ct. Opinion at 20 (citations omitted).

The District Court also stated:

Therefore, under the U.C.C., the London Clearing House and Bank of Montreal could potentially have accepted via a communication of a payment order before any funds were actually transferred.

*Id.* at 20, n. 3.

The District Court also identified two other times for acceptance—when Credit Lyonnais and Bank of Montreal may have accepted:

Similarly, it appears that the record may only include evidence of the latest possible time for acceptance for payment orders received by Credit Lyonnais and Bank of Montreal. That is, although Credit Lyonnais transferred DM 5 to Bank of Montreal at 11:51 a.m. GMT on December 23, and although Bank of Montreal transferred DM 5 to MeesPierson's bank at 11:52 a.m. GMT, both Credit Lyonnais and Bank of Montreal could have issued payment orders/communications constituting acceptance prior to those transfers.

*Id.*

■ After reopening the evidence at the second trial, the record still includes only evidence of the latest possible time for acceptance of any payment orders. Under Article 4A, however, it is critical to know what the banks communicated to each other and ultimately to MeesPierson—and when. The trustee's case cannot rest on speculation or requiring defendants to "disprove" causation. Here, there simply is no evidence of any payment orders between receiving banks, the beneficiary bank, or MeesPierson, thus making it utterly speculative as to whether and when banks in the chain had accepted. Evidence of communications is necessary even if the Debtor held an account at some or all of the receiving banks because § 209(a) makes no distinction between "a receiving bank" and a receiving bank which has a relationship with the sender.

The trustee offered the testimony of Michael Hoffman at the second trial to show that the payment order for the DM 5 million margin payment was not accepted before 11:52 a.m. on December 23, 1998, because Commerzbank, MeesPierson's bank, did not notify MeesPierson of the receipt of this order before that time or

credit its account by this amount before that time. This testimony, however, establishes only the latest possible time MeesPierson's bank, or the beneficiary bank, accepted.

■ The trustee also argues that the Defendants had at least twenty-four hours to stop the wire transfer because the margin call required a currency conversion and was for value the next day (December 23, 1998). In other words, the trustee argues that none of the banks, even the intermediacy banks, could have issued a payment order until the next day. This argument fails, however, because although the transaction was for value the next day, the payment orders could have been sent and accepted for a "determinable amount" immediately. The banks could have accepted, knowing that the value was determinable the next day, before actual payment on December 23, 1998. 810 ILCS 5/4A–209(a). The trustee fails to provide authority for the proposition that currency conversions prevent banks from issuing payment orders intending to carry out the sender's order. The record does not contain evidence of any communications between the banks. Without such evidence, the trustee has not carried his burden of proving the necessary element of causation by a preponderance of the evidence, and judgment must be entered in favor of the Defendants for this reason alone.

*DAMAGES: Has the Trustee proved a violation of 17 C.F.R. § 30.7?*

Because the trustee has not carried his burden on causation, this action fails for that reason alone. Yet the court will also address the issue of damages, and as shown below this issue provides an additional ground for a finding in favor of the Defendants.

■ The Defendants' duties to their creditors, including their customers, included maintaining strict observance of the customers' segregated accounts. The Commodity Exchange Act regulates their handling of money deposited by their customers. Section 4(d)(2) of the Act, which is codified at 7 U.S.C. Section 6(d)(A)(2), provides that a futures commission merchant shall treat all money, securities, and property received from a customer as belonging to such customer. The companion federal regulation, Regulation 1.20(c), provides essentially the same thing:

> All customer funds shall be separately accounted for, and shall not be commingled with the money, securities or property of a futures commission merchant or of any other person, or be used to secure or guarantee the trades, contracts or commodity options, or to secure or extend the credit, of any person other than the one for whom the same are held.

17 C.F.R. § 1.20

Regulations governing trading activity on foreign boards, however, are different from regulations governing trading activity on domestic boards. As this court outlined in its Memorandum of Decision dated January 29, 2009, Part 30 in Chapter 17 of the Code of Federal Regulations applies in this case regarding segregation of customer accounts. This court initially applied 7 U.S.C. § 6 and 17 C.F.R. § 1.20 to this case. However, after the District Court issued its Memorandum Opinion and Order, which did not address the choice-of-law as to the segregation of customer accounts, it became clear to all the parties that the law governing the segregation of customer accounts is *not* 7 U.S.C. § 6 or 17 C.F.R. § 1.20. This realization was supported by a brief filed by the Commodity Futures Trading Commission on May 29, 2008. Section 30.7 clearly applies because that section, unlike § 1.20, governs customers' assets that are used for trading

activity on foreign boards of trade, as opposed to domestic boards of trade.

More specifically, the April 1, 1998 Edition of the Code of Federal Regulation is applicable.[1] Because of its importance to this issue, the section is quoted in full:

Sec. 30.7 Treatment of foreign futures or foreign options secured amount.

(a) Except as provided in this section, a futures commission merchant must maintain in a separate account or accounts money, securities and property in an amount at least sufficient to cover or satisfy all of its current obligations to foreign futures or foreign options customers denominated as the foreign futures or foreign options secured amount. Such money, securities and property may not be commingled with the money, securities or property of such futures commission merchant, with any proprietary account of such futures commission merchant, or used to secure or guarantee the obligations of, or extend credit to, such futures commission merchant or any proprietary account of such futures commission merchant.

(b) A futures commission merchant may deposit together with the secured amount required to be on deposit in the separate account or accounts referred to in paragraph (a) of this section money, securities or property held for or on behalf of other customers of the futures commission merchant for the purpose of entering into foreign futures or foreign options transactions. In such a case, the amount that must be deposited in such separate account or accounts must be no less than the greater of (1) the foreign futures and foreign options secured amount plus the amount that would be required to be on deposit if all such customers were foreign futures or foreign options customers under this part 30, or (2) the foreign futures or foreign options secured amount plus the amount required to be held in a separate account or accounts for or on behalf of customers pursuant to any law, or rule, regulation or order thereunder, or any rule of any self-regulatory organization authorized thereunder, in the jurisdiction in which the depository or the customer, as appropriate, is located.

(c) The separate account or accounts referred to in paragraph (a) of this section must be maintained under an account name that clearly identifies them as such, with any of the following depositories:

(1) A bank or trust company located in the United States or as designated;

(2) Another person registered as a futures commission merchant;

(3) The clearing organization of any foreign board of trade;

(4) Any member of such board of trade; or

(5) Such member or clearing organization's designated depositories. Each futures commission merchant must obtain and retain in its files for the period provided in Sec. 1.31 of this chapter an acknowledgment from such depository that it was informed that such money, securities or property are held for or on behalf of foreign

---

1. See http://frwebgate.access.gpo.gov/cgi-bin/get-cfr.cgi?TITLE= 17 & PART=30 & SEC-TION=7 & YEAR=1998 & TYPE=PDF

futures and foreign options customers and are being held in accordance with the provisions of these regulations.

(d) In no event may money, securities or property representing the foreign futures or foreign options secured amount be held or commingled and deposited with customer funds in the same account or accounts required to be separately accounted for and segregated pursuant to section 4d of the Act and the regulations thereunder.

(e) Each futures commission merchant which invests money, securities or property on behalf of foreign futures or foreign options customers shall keep a record showing the following:

(1) The date on which such investments were made;

(2) The name of the person through whom such investments were made;

(3) The amount of money so invested;

(4) A description of the obligations in which such investments were made;

(5) The identity of the depositories or other places where such obligations are maintained;

(6) The date on which such investments were liquidated or otherwise disposed of and the amount of money received of such disposition, if any; and

(7) The name of the person to or through whom such investments were disposed of.

(f) Each futures commission merchant must compute as of the close of each business day:

(1) The total amount of money, securities and property on deposit in separate account(s) in accordance with this section;

(2) The total amount of money, securities and property required to be on deposit in separate account(s) in accordance with this section; and

(3) The amount of the futures commission merchant's residual interest in money, securities and property on deposit in separate account(s) in accordance with this section. Such computations must be completed prior to noon on the next business day and must be kept, together with all supporting data, in accordance with the requirements of Sec. 1.31.

17 C.F.R. § 30.7

It is equally as important to look at the definitions found in § 30.1. Section 30.1 defines the following relevant terms:

(a) *Foreign futures* means any contract for the purchase or sale of any commodity for future delivery made, or to be made, on or subject to the rules of any foreign board of trade.

. . .

(c) *Foreign futures or foreign options customer* means any person located in the United States, its territories or possessions who trades in foreign futures or foreign options: *Provided,* That an owner or holder of a proprietary account as defined in paragraph (y) of § 1.3 of this chapter shall not be deemed to be a foreign futures or foreign options customer within the meaning of §§ 30.6 and 30.7 of this part.

17 C.F.R. § 30.1

■ To properly show that the Defendants violated customer account segregation rules, the trustee had to show that the Defendants violated the regulations found at 17 C.F.R. § 30.7. In other words, did

the margin payment violate 17 C.F.R. § 30.7? That is, did the transfer on the morning of December 22 cause a loss in segregated funds, and if so, by how much?

The trustee failed to make this showing at the second trial. There is no issue whether Griffin kept its foreign customer funds separate from domestic funds and thus complied with § 30.7(d). In fact, because the domestic accounts were kept separate, Farrel Griffin was able to transfer them to another domestic futures commission merchant and protect them. There also is no dispute that at all relevant times customer funds remained in authorized depositories, as required by § 30.7(c). Thus, if there is any possibility of a violation of § 30.7, it can only be a violation of § 30.7(a) or (b).

The CFTC explained that based on § 30.7, a portion of the customer funds—that is, those that were not necessary to margin existing trades—would not be protected:

> Because the foreign futures secured amount represents only a portion of the customer funds deposited by customers to margin trading on foreign exchanges, there may be a portion of those assets that is not protected by 17 C.F.R. § 30.7. This excess amount is equal to the total customer funds deposited to margin trading on foreign exchanges less the margin actually required to support such trading, taking into account unrealized gains or losses on such trading. The result is that 17 C.F.R. § 30.7 permits FCMs to use the excess amount of a particular customer's assets for purposes other than the transactions of that customer, such as the margin payment for the positions of another customer trading foreign futures on a foreign exchange.

Doc. 155 at 7.

The CFTC also pointed out that any damages would be limited to the portion of the margin payment that came from the foreign secured funds actually used for trades:

> The regulation that was applicable to those funds, 17 C.F.R. § 30.7, would only have been violated if a portion of the $2.6 million margin payment came from funds that were actually being used for trading on foreign exchanges (i.e., margin, guarantee, or secure trades) at the time the margin payment was made. Moreover, if any alleged breach of fiduciary duty were tied to a violation of 17 C.F.R. § 30.7, the damages stemming from that breach would depend on how much of the $2.6 million margin payment came from such foreign futures secured funds.

*Id.* at 8.

Here, there is no evidence showing that § 30.7(a) or (b) was violated when the wire transfer was made on the morning of December 22, 1998. To prove a violation or § 30.7(a), the trustee had to prove that immediately after the wire transfer at issue the segregated account failed to hold money, securities, and property "in an amount sufficient to cover or satisfy all of its current obligations to foreign futures or foreign options customers denominated as the foreign futures or foreign options secured amounts" 17 C.F.R. § 30.7(a). To prove a violation of § 30.7(b), the trustee had to prove that immediately after the wire transfer the amount deposited in such separate account or accounts was less than:

> [T]he greater of (1) the foreign futures and foreign options secured amount plus the amount that would be required to be on deposit if all such customers were foreign futures or foreign options customers under this part 30, or (2) the foreign futures or for-

eign options secured amount plus the amount required to be held in a separate account or accounts for or on behalf of customers pursuant to any law, or rule, regulation or order thereunder, or any rule of any self-regulatory organization authorized thereunder, in the jurisdiction in which the depository or the customer, as appropriate, is located.

17 C.F.R. § 30.7(b)

Here, we have no evidence of the amount in the accounts before or after the wire transfer. We have no evidence regarding the calculation of the foreign futures secured amount or what customers qualified as foreign futures or foreign options customers. The definition in § 30.1 includes only persons located in the United States and excludes an owner or holder of a proprietary account. However, § 30.7(b) treats "other customers" as "foreign futures or foreign options customers." But we do not have evidence demonstrating that § 30.7(b) would apply over § 30.7(a) because there is nothing in the record to show whether or not Griffin deposited "together with the secured amount . . . securities or property held for or on behalf of other customers of the futures commission merchant for the purpose of entering into foreign futures or foreign options transactions." 17 C.F.R. § 30.7(b).

Regardless of whether § 30.7(a) or (b) applies, it was necessary for the trustee to show which customers qualified as "foreign futures or foreign options customers" in order to calculate Griffin's current obligations. For example, as the trustee points out, most of the customer money Griffin used to make the wire transfer was held for Mark J. Walsh. Doc. 237 at 16. In testimony during the first trial, however, Mark J. Walsh stated that he at one time traded a proprietary account for Griffin, but stopped trading that proprie-

tary account on December 18, 1998. See Trial Transcript at 256–57. Thus, it seems that some or all of Mark J. Walsh's losses could have been from a proprietary account he held, which would not be subject to the segregation rules in § 30.7(a) or (b) because "a proprietary account . . . shall not be deemed to be a foreign futures or foreign options customer." 17 C.F.R. § 30.1. Also, the record shows that Park was not a "person located in the United States" because he was a London-based customer and his trades occurred in the London office. Thus, it seems that all of Park's accounts were not regulated by § 30.7(a). From the record, it is unclear how many of the customer-creditors were in fact "foreign futures or foreign options customers." This showing is important because although "it's clear that the transferred funds came from monies held by the company on behalf of other customers" (1/26/05 Oral Opinion Transcript at 9), it is unclear without evidence of the each customer-creditors status as a "foreign futures or foreign options customer" whether the transfer was more than just unethical. Thus, the preponderance of the evidence does not show that the only way the payment could have been made was to use customer funds that were required to be segregated.

In an attempt to prove violation of the regulations, the trustee presented evidence that the day before the DM 5 million margin payment to MeesPierson was received, December 22, 1998, the Debtor was not in compliance with the segregation rules set forth in § 30.7. To prove the lack of compliance, the trustee offered the Debtor's Daily Client Money Segregation Report on Foreign Exchanges for December 22, 1998, which allegedly shows that the Debtor was required to segregate $11,067,010.65 for its foreign exchange customers, but had only segregated $3,310,943.60, leaving a short-

fall of $7,756,067.06. PX 35. First, the trustee's proof fails because the DM 5 million margin call may have been incorporated into the report even though it was not received by MeesPierson until the next day. There is no evidence, however, whether or not the margin call is incorporated into the report. Second, the report shows a shortfall that existed at the end of the day on December 22, 1998. To prove causation, the trustee had to show that a shortfall existed immediately after the DM 5 million margin payment. The report fails to prove such a shortfall.

Because the trustee failed to meet his burden on damages, even if causation had been proved, this court could not determine damages based on whether the Defendants maintained a separate account to cover or satisfy all its current obligations to foreign futures or foreign options customers denominated as the foreign futures or foreign options secured amount pursuant to Part 30 in Chapter 17 of the Code of Federal Regulations.

### Conclusion

The District Court vacated the judgment because it was not satisfied there was adequate proof that the wire transfer could have been cancelled. On remand, following a second trial, the proof remains inadequate and the trustee has not met his burden of proving when during the five legs of the wire transfer it could have been cancelled. Finally, the trustee has failed to carry his burden of proving that any of the funds transferred were from accounts that should have been segregated under 17 C.F.R. § 30.7. Accordingly, for all of these reasons, judgment will be entered in favor of Defendants.