In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3607

IN RE:

GRIFFIN TRADING COMPANY,

*Debtor*.

APPEAL OF:

LEROY G. INSKEEP.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 C 1915—**Ruben Castillo**, *Judge*.

ARGUED SEPTEMBER 16, 2011—DECIDED JUNE 25, 2012

Before EASTERBROOK, *Chief Judge*, and WOOD and
TINDER, *Circuit Judges*.

WOOD, *Circuit Judge.* Griffin Trading Company, a
futures commission merchant, went bankrupt in 1998
after one of its customers, John Ho Park, sustained
trading losses of several million dollars and neither Park
nor Griffin Trading had enough capital to cover these
obligations. This case turns on whether Farrel Griffin and
Roger Griffin (whose first names we use for clarity), the

partners in control of Griffin Trading, breached their fiduciary duties when they allowed segregated customer funds to be used to help cover Park's (and thus Griffin Trading's) losses. In deciding this question, the district and bankruptcy courts applied Illinois's version of the Uniform Commercial Code (U.C.C.) to a series of transactions that was initiated by the margin call that spelled Griffin Trading's downfall. They erred in doing so. We can find no reason why the transactions at issue—which involved banks in England, Canada, France, and Germany, but notably not Illinois—would be governed by Illinois law. This error, however, does not stand in the way of our resolution of the appeal. We find that the bankruptcy court's first decision in this case appropriately relied on Farrel's and Roger's own admissions that they failed in their obligation to protect customer funds. This admission was enough to hold them liable for the entire value of the wire transfer. Accordingly, we reverse the district court's most recent decision in this case and remand for further proceedings.

# I

On December 21, 1998, Park began trading German bonds out of Griffin Trading's office in London. Griffin Trading was not a clearing member of EUREX, the relevant exchange for Park's trades, and so its trades were placed through MeesPierson (a company organized in the Netherlands), which was Griffin Trading's clearing broker. (At one point it was known as Fortis

MeesPierson, reflecting the fact that it was acquired by Fortis Bank in 1997, but in 2009 the name changed back to MeesPierson. For the sake of consistency with the historical record, we refer to it here simply as MeesPierson.) This arrangement created a chain of responsibility: If and when trading losses arose, EUREX would seek to recover from MeesPierson, MeesPierson from Griffin Trading, and Griffin Trading from Park. In order for each party in the chain to reduce its financial exposure, each one required its customers to maintain margin funds in its customer accounts. Thus, Griffin Trading had to keep some money on deposit with MeesPierson, and Park was required to keep a minimum amount of money in his account with Griffin Trading. Park's trades, however, far exceeded his trading limit; in less than two days, Park lost over $10 million.

As a result of these losses, MeesPierson issued a margin call for 5 million Deutsche Marks (DM) on the morning of December 22, payable the next day. (The euro was not launched until January 1, 1999, but initially it operated only as a virtual currency; it became fully effective on January 1, 2002, when all participating national currencies, including the DM, had to be converted. See http://ec.europa.eu/economy_finance/euro/index_en.htm.) This triggered a series of transactions among Griffin Trading's bank accounts. First, at 11:19 a.m. in London on December 22, £1.6 million were transferred from Griffin Trading's account of segregated customer funds at the London Clearing House to its account of customer funds at the Bank of Montreal.

That money was then transferred to its customer-fund account at Crédit Lyonnais, apparently to take advantage of favorable rates.

On the morning of the next day, December 23, Griffin Trading moved that money—converted from British pounds to DM—back to the Bank of Montreal. Finally, at 11:52 a.m. on the 23rd, Griffin Trading answered the margin call by wiring 5 million DM from its account of customer funds at the Bank of Montreal to MeesPierson's account at Commerzbank (a German entity). In all, as a result of Park's trades made in London on a European bond exchange, £1.6 million (or the equivalent in DM) bounced around among Griffin Trading's accounts holding customer segregated funds in England, Canada, and France, until the funds were finally transferred to MeesPierson's account in Germany.

Meanwhile, back in the United States, Farrel learned of Park's losses between 6:00 and 7:00 a.m. Chicago time (noon to 1:00 p.m. UTC) on December 22. He called his partner, Roger, and both of them quickly realized that this "debacle" (their word) was going to send Griffin Trading into bankruptcy unless they quickly found a solution. Their first step was, as they put it, to take charge of Griffin Trading's activities. Farrel, with Roger available by phone, contacted Park, had several conversations with the London office, and, notably, called MeesPierson directly. The bankruptcy court determined that both Roger and Farrel at that time discovered that MeesPierson had issued the 5 million DM margin call to cover Park's initial losses (another

margin call for over 13 million DM would come later that day for the rest of the loss, but it was not satisfied), and that they failed in their primary obligation to protect customer funds by not blocking the 11:52 a.m. wire transfer.

After unsuccessfully attempting to cover the remaining shortfall, Griffin Trading filed for bankruptcy in the Northern District of Illinois on December 30, 1998. The trustee in bankruptcy initiated this adversary action against Roger and Farrel in 2001, and the suit went to trial in 2004. At trial, the bankruptcy court found that Roger's and Farrel's failure to "stop the wire transfer paying the margin call constituted gross negligence and constituted a violation of their fiduciary duties to their creditors." *Inskeep v. Griffin* (*In re Griffin Trading Co.*), No. 01A00007 (Bankr. N.D. Ill. Jan. 26, 2005). Farrel and Roger appealed the bankruptcy court's decision to the District Court for the Northern District of Illinois, arguing that the application of Illinois's U.C.C., rather than foreign law, was error. The district court found this argument forfeited, but it nevertheless thought the bankruptcy court applied the wrong law—in particular, the wrong section of the U.C.C. See No. 05 C 1834, 2008 WL 192322, at *7 (N.D. Ill. Jan. 23, 2008). On remand, the bankruptcy court reversed its earlier course, holding that the trustee failed to establish, as a matter of Illinois law, that Farrel and Roger actually caused the loss of customer funds. 418 B.R. 714, 718-21 (Bankr. N.D. Ill. 2009). The court further held that the trustee failed to establish damages. *Id.* at 721. The district court affirmed, 440 B.R. 148, 164 (N.D. Ill. 2010), and the trustee now appeals.

## II

Even though this case is over a decade old and has generated at least four judicial decisions, this is the first time that it has reached the court of appeals. Under 28 U.S.C. § 158(d)(1), our jurisdiction extends to "all final decisions" issued by the bankruptcy and district courts. After carefully reviewing the several opinions before us, we regret to say that the bankruptcy and district courts erred from the outset by applying Illinois law. Despite this error, however, we agree with the result in the bankruptcy court's initial decision: Roger and Farrel are liable for causing the creditor loss alleged in this case.

### A

The bankruptcy court's first decision concluded that Farrel and Roger were liable for damages because they could have stopped the wire transfer and their failure to do so constituted a breach of their fiduciary duties. It based this finding on the authority that the two would have had under the U.C.C. On appeal to the district court, Farrel and Roger contested that ruling, asserting that the U.C.C. could not provide the operative rule of law for "a series of four transfers between Griffin Trading's bank in England to MeesPierson's bank in Germany." 2008 WL 192322, at *5. The district court rejected that argument. Citing cases that considered appeals from district courts to the court of appeals, the district court chided the defendants for waiting until its first appeal to raise the question of choice of law (especially foreign law) and ruled the argument forfeited. *Id.* at *5-*6. This

ruling failed to appreciate the nature of Federal Rule of Civil Procedure 44.1, and amounted to an abuse of discretion.

The district court suggested that the defendants' alleged forfeiture was especially "problematic" because it implicated Rule 44.1, which was made applicable in bankruptcy court by Federal Rule of Bankruptcy Procedure 9017. 2008 WL 192322, at *5. Bankruptcy Rule 9017 is a rule of evidence, however, not a rule of procedure or pleading. The Bankruptcy Rule simply clarifies that the Federal Rules of Evidence and those Civil Rules that pertain to evidentiary questions—Rule 43 (Taking Testimony), Rule 44 (Proving an Official Record), and Rule 44.1 (Determining Foreign Law)—"apply to cases under the [Bankruptcy] Code." Although it is true that Rule 44.1 requires any party who intends to present evidence of foreign law to "give notice by a pleading or other writing," the language of the rule itself reveals that no particular formality is required. Any "other writing" will do, as long as it suffices to give proper notice of an intent to rely on foreign law. As applicable here, Bankruptcy Rule 9017 and Civil Rule 44.1 govern the admission and review of different types of evidence of foreign law, and they confirm that this is an issue of law for the court, not an issue of fact.

Even strictly adhering to Rule 44.1's notice requirement, we conclude that the court and the parties were adequately alerted to the possible applicability of foreign law in a timely manner. As the notes to the Rule explain, the required notice need only be "reasonable" so as to

avoid an "unfair surprise." FED. R. CIV. P. 44.1, advisory committee's note, 1966 adoption. Furthermore, the advisory committee's note suggests that "the pertinence of foreign law [may be] apparent from the outset," and so "notice can be given conveniently in the pleadings." In this case, the trustee's own complaint sufficed to give notice about the applicability of foreign law. Count IV of the Adversary Complaint, an "Action For Breach of Fiduciary Duty," explicitly cites Park's trading activity in London as the precipitating event, and points to the transfer to MeesPierson, a Netherlands entity that used a German bank, as the cause for liability. This was enough to put all parties on notice that the transactions might be governed by foreign law. Nor does it matter that the defendants' answer denied the trustee's allegations, even though it was the defendants who later sought to raise the question of foreign law: "If notice is given by one party it need not be repeated by any other and serves as a basis for presentation of material on the foreign law by all parties." FED. R. CIV. P. 44.1, advisory committee's note ¶3, 1966 adoption.

Moreover, even if these references in the complaint were not as clear then as they now seem, the notes to the rule eliminate any remaining question. The notes show that the rule expressly contemplates the possibility that the need to answer questions of foreign law may become "apparent" even as late as trial. *Id*. Thus, if the reference to the foreign activity and foreign payment in the complaint was not enough to reveal that all relevant activity took place outside the United States, by the time all of the transactions at issue had been ex-

plored at trial, it would have been obvious that it was at a minimum very unlikely that a court in Illinois would have concluded that local law applied. *Id.*; see also *Yessenow v. Executive Risk Indemn., Inc.*, 953 N.E.2d 433, 438 (Ill. App. Ct. 2011). Every relevant action took place outside the United States. The losing trades originated in England. Griffin Trading's various bank accounts were in England, Canada, and France. MeesPierson is based in the Netherlands, and its bank account was in Germany. The bankruptcy and district courts erred by applying Illinois law.

B

Having established that the U.C.C. should not have been used, one might think that we need to choose an alternative among the various legal systems affected by Griffin Trading's demise. We conclude, however, that this is not necessary. The important point is that the U.C.C., under which a wire transfer can be reversed until the receiving bank accepts a payment order, cannot provide the operative rule of law. See U.C.C. § 4A-211, codified in Illinois at 810 ILCS § 5/4A-211. The bankruptcy and district courts believed that the trustee's inability to pin down the precise moment of acceptance allowed the Griffins to argue that there was no proof that they could have stopped the transfer. But that assumes that the trustee had the burden of demonstrating compliance with the U.C.C. In fact, he had no such burden because the U.C.C. does not provide the applicable rule of law. Nor is this a case in which there is

no real difference among legal systems. Our research reveals, for example, that the European Union has a Directive on Payment Services in the Internal Market (adopted in 2007) that permits a payer to revoke by the end of the business day preceding the day agreed for debiting the funds. See http://eur-lex.europa.eu/ LexUriServ/LexUriServ.do?uri=OJ:L:2007:319:0001:01:EN :HTML, Art. 66.3 (last visited June 21, 2012). The UNCITRAL Model Law on International Credit Trans- fers offers another approach: It provides that "[a] payment order may not be revoked by the sender unless the revocation order is received by a receiving bank . . . at a time and in a manner sufficient to afford the receiving bank a reasonable opportunity to act . . . ." art. 12(1) (1994); see also *id*. art. 12(2) (beneficiary's bank). More importantly, it was neither the trustee's burden or the court's to canvass all possible foreign laws. It was the Griffins's responsibility to do so. *Banque Libanaise Pour Le Commerce v. Khreich*, 915 F.2d 1000, 1006 (5th Cir. 1990) (the party seeking to rely on foreign law must provide "clear proof of the relevant . . . legal principles" to the trial court, even though the issue is reviewed as a question of law on appeal). As the parties seeking to rely on foreign law, they have not pointed to any possible option applicable at the time of these transactions under which they would have been disabled from revoking the transfers before the margin call was answered on December 23.

In any event, it appears to us that Farrel and Roger would not have been able to meet this burden: Every one of the possible applicable laws requires a causal link

between the challenged activity (or inactivity) and the alleged injury, and none attaches the significance to the moment of acceptance that—we assume for the sake of argument—U.C.C. Article 4A does. We see no need to delve further into the details of the different possible applicable laws. See *Prudential Ins. Co. of Am. v. Kamrath*, 475 F.3d 920, 924 (8th Cir. 2007) ("Before applying . . . choice-of-law rules . . . [a] court must first determine whether a conflict exists."). The only question properly before us is whether Farrel's and Roger's inaction caused Griffin Trading to lose its customers' money. This question has two parts: (1) Did Farrel and Roger know about the scheduled wire transfer to MeesPierson; and (2) if so, could Farrel and Roger have stopped it under governing principles of commercial law? These are both mixed questions of fact and law that the bankruptcy court addressed in its first decision, and so our review is only for clear error. *Levenstein v. Salafsky*, 414 F.3d 767, 773 (7th Cir. 2005) (clear error typically applies except in limited instances, such as cases presenting constitutional questions).

The bankruptcy court's first ruling answered both of these questions in the affirmative. Judge Black discredited the defendants' contention that they did not know about the 5 million DM margin call. The court found it "very unlikely that the defendants would not have learned of the first margin call from their employees in the London office." Their assertion was further undermined by evidence showing that Farrel and Roger called MeesPierson directly. The court found it "strange" that the defendants would ask the court to "believe that people in their posi-

tion would call the bank that had issued a margin call of that size and not discuss the margin call and yet discuss the . . . need for, quote, 'more time,' end quote." The bankruptcy court found as a fact that after that phone conversation Farrel and Roger knew about the scheduled transfer of customer funds.

The bankruptcy court further determined that both Farrel and Roger "took no action to prevent the transfer" despite having "time to stop it." This is consistent with the evidence presented at the first trial. Farrel learned of Park's trades between noon and 1:00 p.m. UTC on December 22. Yet the actual transfer to MeesPierson was not executed until nearly a full day later, just before noon on December 23. As we have already noted, the Griffins have not suggested, and we cannot find, any legal standard under which this would not have provided ample opportunity for them to prevent the transfer of customer funds to MeesPierson. See *UNCITRAL Model Law on International Credit Transfers*, art. 12(1), 12(2) (1994) (a transferor needs to give a bank only a "reasonable opportunity to act" in order to cancel a wire transfer); Benjamin Geva, *The Wireless Wire: Do M-Payments and UNCITRAL Model Law on International Credit Transfers Match?*, 27 BANKING & FIN. L. REV. 249, 254-55 (2012) (same). Indeed, the defendants have never argued that under U.K., or German, or Canadian, or Dutch law that they were powerless to take corrective action. To the contrary, they conceded that they "had the ability to contact Griffin Trading Company's banks and direct them not to go through with the wire transfer." See 1 Cresswell, P.J., ed., THE ENCYCLOPAEDIA OF

BANKING LAW, Div. D1 ¶ 224 (the duties that arise between a payer and a payer's bank regarding a funds transfer are predominantly contractual). Their failure to take advantage of this window of opportunity caused the creditor loss at issue in this case.

In the final analysis, the bankruptcy court concluded that Farrel and Roger "knew about [the wire transfer] while there was still time to stop it." Given the evidence that the defendants were in constant contact with the London office and had called MeesPierson themselves, coupled with their admissions at trial that they had the opportunity to cancel the transfer, we cannot say that this determination was clearly erroneous.

**III**

Having concluded that the defendants' inaction caused the creditor loss at issue, we turn now to the question of damages. The trustee alleges that the defendants violated 17 C.F.R. § 30.7, which requires futures commission merchants to protect customer funds, when they transferred customer funds to MeesPierson, and thus that the full extent of this violation—*i.e.*, the whole wire transfer—represents damages. One might wonder why U.S. law should apply here, given the earlier discussion about choice of law. The answer is that the discussion above considered Griffin Trading's legal rights vis-á-vis its foreign agents (its banks), and we have concluded that these private arrangements are not governed by Illinois law. Here, in contrast, we consider Griffin Trading's obligations to its customers under a

regulatory regime, in its capacity as a futures commission merchant registered with the U.S. Commodity Futures Trading Commission (CFTC) and subject to the CFTC's domestic and extraterritorial regulations. Griffin Trading is subject to the Commodity Exchange Act, which imposes requirements on futures commission merchants for the handling of customer funds and gives the CFTC authority to impose special regulations to "safeguard customers' funds" in connection with trading activity on foreign exchanges. 7 U.S.C. § 6(b)(2)(A); 17 C.F.R. § 30.7; see also *Morrison v. National Austl. Bank*, 130 S. Ct. 2869, 2882-83 (2011) (discussing when statutes have extraterritorial effect).

Specifically, § 30.7(a) requires that a futures commission merchant "maintain in a separate account or accounts money, securities and property in an amount at least sufficient to cover or satisfy all of its current obligations to foreign futures." That section also provides that such segregated funds "may not be commingled with the money, securities or property of such futures commission merchant . . . or used to guarantee the obligations of . . . such futures commission merchant." That is, merchants that are entrusted with their customers' money have special obligations, and those merchants are liable for losses arising out of violations of those obligations.

In its second ruling, the bankruptcy court held that the trustee had failed to prove that Farrel and Roger had violated this regulation, and thus that the trustee had not proven any damage to the estate. The court

faulted the trustee for providing "no evidence of the amount in the accounts before or after the wire transfer" and "no evidence regarding the calculation of the foreign futures secured amount." 418 B.R. at 725. The record, however, belies these findings. In fact, it reveals that the wire transfer necessarily transmitted customer funds to MeesPierson in order to satisfy Griffin Trading's own obligations.

At the second trial, Farrel testified that Griffin Trading's London account of segregated customer funds existed to secure customer activity out of its London office; that is, those funds were supposed to "satisfy all of its current obligations to foreign futures." This means that all of the money in that account was subject to the strictures of § 30.7. Yet the CFTC reported that, at the close of the day on December 22, Griffin Trading's account was underfunded by over $7 million. Because the margin call was valued at approximately $3 million, the entire transfer must have been made using customer funds. And, despite the bankruptcy court's concern, this would be the case whether or not the $7 million shortfall was the reason for the pending wire transfer. Furthermore, Park's account with Griffin Trading was running a deficit at the time of the wire transfer, and so it cannot be the case that Griffin Trading used Park's money to satisfy the margin call. (If Park's account had not been in the red, it would have been perfectly allowable for Griffin Trading to draw on it, since, as we explained earlier, the debt was actually Park's.) This evidence demonstrates that Griffin Trading necessarily used restricted funds that its customers

had entrusted to it in order to satisfy its own obligations to MeesPierson.

The defendants' failure to stop the wire transfer to MeesPierson was a breach of their fiduciary duties. That breach caused a loss to Griffin Trading's customers equivalent to the amount of the entire transfer. The bankruptcy estate of Griffin Trading is thus entitled to proceed against Farrel and Roger for the damages they caused. We REVERSE and REMAND to the district court for proceedings consistent with this opinion.